UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:18CR00308 (JBA) |
| | : | |
| v. | : | |
| | : | |
| ANDREW CUNNINGHAM | : | April 5, 2019 |

DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, Andrew Cunningham, respectfully files this sentencing memorandum to assist the Court in arriving at a sentence that is sufficient, but not greater than necessary to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a). Mr. Cunningham faces a significant advisory guidelines range of 210 to 262 years incarcerated (as contemplated by the plea agreement) and a mandatory minimum sentence of 10 years incarcerated. He has agreed to ask for no less than 210 years, the bottom of the recommended guidelines range.

For the reasons set forth in this memorandum, a sentence of 210 months to run concurrent with his state sentence imposed on May 16, 2017, with credit dating back to the his arrest for the state offense on May 2, 2017, is sufficient but not greater than necessary to address the 3553(a) factors.

I.    Sentencing Standard

18 U.S.C. § 3553(a) is comprised of two distinct parts. The prefatory clause states: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph (2) of subsection 3553(a) provides:

(2)    the need for the sentence imposed—

>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Accordingly, the sentence imposed must be the minimum necessary to comply with these general purposes of sentencing. The second part of § 3553(a) contains the factors that the court must consider in determining the minimally sufficient sentence, which are, in relevant summary:

>   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2) the kinds of sentences available;
>
>   (3) the Guidelines and policy statements issued by the Sentencing Commission; and
>
>   (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

II.     Personal History

Andrew Cunningham is 38 years old. His childhood was chaotic and sad. While he never suffered physical or sexual abuse at the hands of any adult in his life, he was traumatized and neglected by his parents. His mother deserted Andrew, his older brother, and his father when Andrew was five or six years old. PSR, ¶¶53, 58, 59. Her abrupt departure traumatized Andrew. Id. Other than providing them with food and shelter, and making sure that they

attended school, Andrew's father was incapable of caring for the boys because he was a severe alcoholic who drank all day long and, when drunk, was verbally abusive. Id., 53, 54, 58, 59.

Andrew's paternal aunt, Linda Cunningham, advised that not only was Andrew's father an alcoholic, but his mother was also one.  PSR, ¶58.  She described the level of neglect that Andrew and his brother suffered, being left to fend for themselves due to their father's intoxication.  The boys would go to school with dirty clothes, and occasionally, she and her mother (Andrew's grandmother) would go over to their house to help take care of the boys clean their clothes. Id.  Andrew's father cycled in and out of jail and in-patient substance abuse treatment as Andrew was growing up.  Id., 58.

Not surprisingly, Andrew was in dire need of therapy as a child in elementary school and throughout high school, so he would meet with the school guidance counselor on a weekly basis. PSR, ¶54.  He was a shy child with a speech impediment (as the result of trauma to his tongue when he fell out of his high chair at three years old).  It was not until middle school, however, that one of his counselors finally contacted DCF make them aware of Andrew's home life.  Id. While DCF did not remove Andrew and his brother from the home, they remained involved in their lives during Andrew's middle school years, checking in periodically to ensure that their father met whatever minimal level of care that DCF required.  Id.

Andrew's father, now sober, acknowledges the difficult childhood Andrew suffered as the result of his own illness and neglect.  PSR, ¶59.  Despite the difficulties, he describes Andrew as a "good" and "shy" child, lacking in self-confidence.  Id.  Andrew's father admitted the shame and embarrassment that his addiction caused his children, specifically recalling a D.A.R.E. program that Andrew was participating in when a call came in over the police instructor's radio reporting a DUI --- the arrestee was Andrew's father.  Id.  The other children in

Andrew's class heard it. Id. The shame and embarrassment of his father's disease was a constant part of Andrew's childhood and teenage years.

As a child, Andrew witnessed his father under arrest several times, and most horrifically, Andrew happened upon the scene of a near fatal car accident in front of his home, involving his father, who was intoxicated. PSR, ¶¶55, 59. The incident occurred when Andrew's father was supposed to have picked him up from school. Id. Andrew waited and waited, but his father never arrived. Eventually, Andrew was able to get a ride home from the principal. Id. As they neared Andrew's home, they came upon the accident. Id., 55. Lifestar was on the scene and medical personnel were loading Andrew's father into the helicopter. Id. Andrew approached the medical personnel and was told that his father was dead. Id. Andrew was 13 years old when this happened. Id. His father was revived at the hospital, and once he recovered from his injuries, he was sentenced to serve 18 months in jail for the accident. Id.

For five years, beginning when Andrew's father went to jail, Andrew went to live with his mother and her husband in Massachusetts. Id., ¶56. Eventually, however, he moved back in with his father because he had forgiven his father for the trauma that his father had caused him. Id., 57. The accident caused Andrew's father significant physical pain and subsequent surgeries. Id., 57, 59. As a result, he was prescribed opiates. Id. His addiction expanded beyond alcohol to pain medication and, eventually, heroin. Id.

In 2006, Andrew's father could no longer afford to pay bills so they had to give up their home. PSR, ¶57. They were homeless and living in an RV in a neighbor's yard. Id. Andrew eventually began living in various places with different friends and a cousin, but returned to live with his father in 2009. His father continued to use heroin until 2011 when he overdosed on fentanyl. He survived the overdose and has been sober since then. Id., 57.

Despite the trauma that his father caused him, Andrew has always taken on the role of his father's caretaker. As his aunt describes, after Andrew's arrest in 2014, he worked and helped support his father, living with him, and taking care of him. Id., 58. Andrew's father suffers several disabilities and needs help with basic chores. Id. Andrew would help around the house and go grocery shopping for his father. Id.

Andrew suffers from anxiety and depression. PSR, ¶¶64-66. Prior to 2014, when he was diagnosed, he used marijuana daily to cope with both issues; he says it helped him function "like a regular person." Id. In 2014, during his incarceration in Illinois, he was diagnosed with depression and anxiety and prescribed 40 mg of Celexa[1] daily. Id. He currently sees a mental health counselor provided through the Department of Corrections. Id.

Andrew is a high school graduate and attended Porter and Chester Institute in Enfield for two years, earning an Automotive Technician certificate. Id., 66. As the PSI sets forth, he has maintained fairly steady employment since 2005, and currently works as a tier man at Cheshire Correctional Institution, cleaning the housing unit. Id., 68-73. He has held the job for nearly two years. Id. His jobs have included assistant manager in the bakery department of Shop Rite, assistant manager of a Sunoco gas station, and working at ServPro (a residential and commercial cleaning company). Id.

III.  Offense Conduct

On November 6, 2018, Mr. Cunningham pleaded guilty to Enticement of a Minor to Engage in Illegal Sexual Activity, in violation of 18 U.S.C. §2422(b). There is no debate that Mr. Cunningham's conduct was serious, and the very high sentencing guidelines range reflects

---

[1] "Celexa (citalopram) is an antidepressant medication that's often prescribed to treat both mood and anxiety disorders." https://www.verywellmind.com/faqs-about-celexa-for-panic-disorder-2584294

this. Mr. Cunningham accepted responsibility for his offense, and he recognizes and deeply regrets the harm he has caused to MV.

IV.     Guidelines Sentencing Range

Pursuant to the plea agreement, the parties agree that the total offense level was 35 pursuant to U.S.S.G. §2G2.1, including three levels deducted for acceptance of responsibility pursuant to § 3E1.1. Mr. Cunningham's criminal history category is IV, but the parties contemplated a criminal history category of III in the plea agreement. The presumptive guidelines range for offense level 35 and CHC III as set forth in the plea agreement is 210 to 262 months. The presumptive guidelines range for offense level 35 and CHC IV as contemplated in the PSR is 235 to 293 months. The mandatory minimum sentence is 10 years (18 U.S.C. § 2422(b)). There is also a mandatory minimum term of supervised release of five years with a maximum of life. (18 U.S.C. § 3583(k)).

Parties have agreed not to seek departures or variances outside of the agreed upon guidelines range in the plea agreement, 210 to 262 months. However, with the defendant's correct criminal history category as IV, the guidelines range elevates to 235 to 293 months. The defendant seeks a downward departure to return his guidelines range to that contemplated in the plea agreement, 210 to 262 months.

### A. A Downward Departure Under United States v. Fernandez, 877 F2d 1138 (2d Cir. 1989) is Warranted

The Court may depart from the guidelines in order to give effect to the plea bargain "if such departure is warranted." United States v. Fernandez, 877 F2d 1138, 1145-1146 (2d Cir. 1989). Based on Fernandez, the Court should downwardly depart to the guidelines range of 210 to 262 months to give effect to the plea agreement. It appears from the PSR that the Government agrees with this request.

### B. A Downward Departure Is Warranted Because a Criminal History Category IV Overstates the Defendant's Criminal History

Mr. Cunningham's Criminal History Category IV overstates the seriousness of his criminal record. Pursuant to the Guidelines §4A1.3(b)(1), "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. . . ."

The Court should depart downward to a guidelines range of 210 to 262 months on the basis that Mr. Cunningham's criminal history is overstated by three criminal history points. He has eight criminal history points but should be treated as though he has five. The resulting Criminal History Category should be III, changing the Guideline range to 210 to 262 months.

Technically, under the guidelines, Mr. Cunningham's May 16, 2017 convictions for Attempted Enticement of a Minor and Attempted Illegal Sexual Contact receive three points; however, the unique circumstances of his arrest in that matter and its relatedness to the instant case warrants a departure. The following fact pattern demonstrates that the cases were related, that he was not afforded an opportunity to reform between the two offenses, and that a downward departure is warranted:

Mr. Cunningham was arrested on May 2, 2017, after his parole officer was alerted to Mr. Cunningham's conduct in the instant case – his online interactions with MV, which ended near the end of March, 2017. As a result, the Connecticut State Police began a new investigation According to an incident report prepared by the Connecticut State Police, they investigated Mr. Cunningham's conduct by setting up a decoy minor with whom Mr. Cunningham engaged in online communication and planned to meet in order to have sexual relations. PSR, ¶43. Mr. Cunningham was arrested on May 2, 2017 when he arrived at Union Station to meet the decoy

minor. Mr. Cunningham immediately admitted his conduct and pleaded guilty (only two weeks after his arrest) in the Union Station/state case. Id. He was incarcerated upon his arrest on May 2, and then arrested on the previously occurring federal charges after he began serving his state sentence.

Thus, it is not as though Mr. Cunningham first committed the state offense, was arrested, convicted, and served his sentence, and then went out and committed the instant federal offense. There was no opportunity between the two offenses for Mr. Cunningham to reform. The significance of an intervening arrest between sentences is that "an offender who has been arrested between his first and second offenses has perhaps demonstrated, more than one who has had no intervening arrest, that he is unlikely to mend his ways." United States v. Butler, 970 F.2d 1017, 1025 (2d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992). Indeed, many states with statutes prescribing enhanced punishment for habitual offenders require that the offender have had the opportunity to reform between offenses, in order for the prior offenses to count as predicates under the enhancement statute.

The Connecticut Supreme Court in State v. Ledbetter, 240 Conn. 317, 692 A.2d 713 (1997), interpreted Conn. Gen. Stats. § 53a-40(d), the persistent felony offender statute, which requires that the two predicate offenses follow the sequence of (for the first predicate offense) 1. Commission of the offense, 2. Conviction for the offense, and 3. Punishment for the offense, and then the same sequence for the second predicate offense, otherwise they would not qualify as predicates. See State v. Ledbetter, 240 Conn. 317, 338-339 (1997); see also Hall v. State, 473 A.2d 352, 356-57 (Del. 1984) (law only applies when second conviction takes place after sentencing has been imposed for first offense); State v. Metoyer, 612 So. 2d 755, 759 (La. App. 1992) (multiple convictions based on guilty pleas entered on same day constitute single

conviction for purpose of habitual offender sentencing); see also annot., 7 A.L.R.5th 289 (1992) ("The prevalent view is that enhanced punishment cannot be imposed unless all of the defendant's prior convictions preceded commission of the principal offense, and each prior offense and conviction occurred in chronological sequence. Thus, each offense, following the first, must have been committed after the defendant's conviction of the immediately preceding offense."). The rationale behind the sequentiality requirement is that enhanced punishment for habitual offenders is justified when a defendant has not reformed after being given the opportunity to do so. See, Ledbetter, 240 Conn. 338-339.

Applying this rationale to Mr. Cunningham requires a reduction by way of a downward departure from his criminal history category from a five to a four. He should not be punished further by the May 16, 2017 state conviction even though he was arrested later for the instant offense. The relationship between the cases is evident based on the facts of the May 2, 2017 arrest, they should not be treated as discrete offenses for purposes of calculating his criminal history score. See United States v. Bowser, 941 F.2d 1019, 1024-1025 (10th Cir. 1991) (affirming departure where defendant's two previous convictions were committed when he was only 20 years old within two months of each other and were punished by concurrent sentences.) This ground also supports a variance to the agreed upon range of 210 to 262 months, in the event that the Court does not find it sufficient to support a downward departure.

V.      A Sentence of 210 Months is Appropriate

The District Court must consider the Guidelines as well as the other factors set forth in 18 U.S.C. § 3553(a) when determining a sentence that is "sufficient, but not greater than necessary" to meet the purposes of federal sentencing. *United States v. Booker*, 543 U.S. 220, 258 (2005); *United States v. Crosby*, 397 F.3d 103, 110-14 (2d Cir. 2005). A sentence that is "sufficient, but

not greater than necessary" under 18 U.S.C. § 3553(a) is the lowest possible sentence that accounts for all of the relevant statutory factors. Thus, if a District Court believes a lower sentence will be as effective as a higher sentence in light of the relevant factors, it must choose the lower sentence. See United States v. MinistroTapia, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.")

Mr. Cunningham respectfully asks the Court to impose a bottom of the guidelines sentence of 210 months. Such a sentence is appropriate for a number of reasons. First, the guidelines range is very high – sentencing Mr. Cunningham above 210 months is unnecessary to achieve the objectives of 3553(a). A sentence of 210 months is ample time in which to afford him the psychological treatment that he so clearly needs to help him address his offending conduct. This in turn will cut down on the risk of him recidivating and will promote public safety. It bears little explanation that a sentence of 210 months – or 17 and one-half years, sends the message that this is a very serious offense that will not be tolerated by society. A longer sentence is not needed to underscore this point.

As an individual deterrent, a 210 month sentence is effective. The longest term Mr. Cunningham has served incarcerated was two and one-half years for the Illinois offense, for which he received a five year sentence. He was admitted to parole at the half-way mark of the sentence. A 210 months sentence is seven times longer than any sentence he has served thus far.

In United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

While the Mishoe decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here. Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence. Where an individual has served relatively minimal periods of incarceration, there is no reason to believe in such an instance that an excessively prolonged sentence will be more effective than a lesser sentence that is still much higher than any term previously served.

Additionally, weighty consideration should be given to Mr. Cunningham's personal characteristics, particularly his traumatic and chaotic childhood, and the resulting anxiety and depression he has suffered as an adult. It is well established that the effects of childhood neglect, abuse, and trauma have far-ranging consequences beyond childhood, and that may extend well into adulthood, impacting not only a person's physical and mental health, but also in social relationships, education, work, and the criminal justice system. See Ann Petersen, et al., New Directions in Child Abuse and Neglect Research at 5-6, available at http://www.nap.edu/catalog/18331/new-directions-in-child-abuse-and-neglect-research (2013).

The link between childhood exposure to trauma and adult criminal behavior is well-established in social science literature.[2] Because trauma interferes with the brain's gate-keeping functions and ability to filter information, children who experience trauma, including through witnessing acts of severe violence, may have impaired ability to pay attention and concentrate, which in turn has a detrimental effect on their school performance.[3] Childhood trauma affects brain development and may lead to difficulty controlling impulses, to delay gratification, to

---

[2] Craig Haney, Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation, 36 HOFSTRA L. REV. 835, 856-57 (2008).

[3] See Bessel Van Der Kolk, The Body Keeps Score: Brain, Mind, and Body in the Healing of Trauma at 70 (2014).

appreciate the consequences of risky or socially unacceptable behavior, and to tolerate interpersonal conflict.[4]

In 1990, two doctors conducted a landmark study that revealed a link between what they termed Adverse Childhood Experiences (ACEs) and later medical outcomes. ACEs included physical and sexual abuse, physical and emotional neglect, and family dysfunction, such as having parents who were divorced, mentally ill, addicted, or in prison.[5] The doctors found that more ACEs correlated with worse outcomes and fewer ACEs correlated with better outcomes. ACEs are associated with learning and behavioral problems, which translate into higher rates of workplace absenteeism, financial problems, and lower life-time income.[6] The study's groundbreaking contribution was a detailed account of how children do not "grow out" of traumatic experiences -- they carry the marks of that trauma in their brains and in their bodies.

The trauma that Mr. Cunningham suffered in childhood has undoubtedly impacted him negatively as an adult. It does not serve as an excuse for his conduct, but is a mitigating factor that sheds some light on his conduct in this case. Consideration of this factor justifies sentencing him to the bottom of the advisory guidelines range.

Finally, for all of the reasons stated herein, particularly, the principle of incremental punishment and the relatedness between the instant offense and the May 16, 2017 state conviction, it is appropriate to run Mr. Cunningham's 210 month sentence concurrent[7] with the

---

[4] Robert L. Listenbee, Jr., at al., Report of the Attorney General's Taskforce on Children Exposed to Violence 172 (2012), at https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

[5] See Bessel Van Der Kolk, The Body Keeps Score: Brain, Mind, and Body in the Healing of Trauma at 146 (2014).

[6] Id.

[7] In a case involving an undischarged term of imprisonment for an offense that is not relevant conduct to the instant offense, the sentence for the instant offense may be imposed to run

state sentence, and to give Mr. Cunningham credit for his time incarcerated since his arrest on May 2, 2017.

VI.     Conclusion

For the foregoing reasons, Andrew Cunningham respectfully asks the Court to impose a sentence of 210 months, concurrent to his state sentence, and with credit back to May 16, 2017.

    Respectfully submitted,
THE DEFENDANT,
Ryan Cunningham

/s/ Moira L. Buckley
Moira L. Buckley
Assistant Federal Defender
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106-1976
Phone: (860) 493-6260
Bar no.: ct18803
Email: moira_buckley@fd.org

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Moira L. Buckley
Moira L. Buckley

---

concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense. See USSG §5G1.3(d).